UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA,             :

           v.                   :       Indictment No. 1:23-cr-179 (LJL)

JULIAN GONZALEZ,                :

            Defendant.        :
------------------------------------------------------------x


MEMORANDUM OF LAW IN OPPOSITION
TO
GOVERNMENT'S MOTIONS IN LIMINE

Patrick Brackley, Esq
Attorney for Julian Gonzalez
233 Broadway  Suite 2370
New York, New York 10279
(917)-523-7265
Email: patrickbrackley@aol.com

TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………….................................................iii

    A. Preliminary Statement…………………………………………………..1

    B. The Charged Offense And Its Elements………………………………..1

    C. The Events Leading To The Offense Conduct…………………………2

        1. The Facts Establishing Probable Cause………………………………2

        2. St Patrick's Day 2023…………………………………………………3

        3. Mr. Gonzalez's Post-St. Patrick's Day Activities…………………….4

ARGUMENT

I.     Unnecessary To Complete The Story Of The Charged Crime, The Court
      Should Rule The Facts On Which The Agents Secured Their Search
      Warrant Inadmissible As Direct Evidence And More Prejudicial Than
      Probative………………………..................................................................6

II.    FRE 803 Permits Mr. Gonzalez To Introduce His Statement At The Time He
      Agreed To Permit Agent Tactuk To Retain The Subject Phone To Controvert
      The Government's Theory That It Was His Concern That The Phone's
      Contents Could Incriminate Him That Prompted The Offense Conduct…...…….8

III.   Should The Court Rule Them Relevant, Mr. Gonzalez Consents To Admitting
      Hotel And DMV Records Without Custodial Witnesses…………………………9

IV.  Where Mr. Gonzalez Was Informed That He Was Free To Leave Both Before
      And After The Offense Conduct, Nothing He Did Thereafter Can Fairly Be
      Found To Be Flight From The Consequences *Of The Charged Offense*…………..9

V.   Introduction of Mr. Gonzalez's Prior Convictions Would Be More
      Prejudicial Than Probative………………………………………………...12

i

VI.    Lest It Infringe On Mr. Gonzalez's Right To Present A Defense, The Court
       Should Be Cautious In Limiting The Scope Of Closing Argument……………...14


VII.    Mr. Gonzalez Does Not Seek To Introduce Evidence Of The Consequences
        Of Conviction…………………………………………………………………..15


VIII.    Mr. Gonzalez Does Not Expect To Seek To Elicit Evidence About The
         Confidential Informant…………………………………………………………15


CONCLUSION…………………………………………………………………...........15

<u>TABLE OF AUTHORITIES</u>

<u>SUPREME COURT CASES</u>

<u>Herring v. New York</u>, 422 U.S. 853 (1975)……………………………………....…14

<u>Luce v. United States</u>, 469 U.S. 38 (1984)………………………………………..1


<u>OTHER FEDERAL CASES</u>

<u>United States v. Al-Sadawi</u>, 432 F. 3d 419 (2d Cir. 2005)……………………………9-10

<u>United States v. Berry</u>, et al., No. 2:01-CR-545 (E.D.PA)…………………………..……12

<u>United States v. Carboni</u>, 204 F.3d 39 (2d Cir. 2000)……………………………………6

<u>United States v. Hamlett</u>, No. 3:18-cr-24 (VAB), 2018 WL 4854627
(D. Conn. Oct. 5, 2018)………………………………………………………………………1

<u>United States v. Hayes</u>, 553 F.2d 824 (2d Cir. 1977)……………………………………13

<u>United States v. Johnson</u>, 16-CR-457-1 (NGG), 2017 WL 5125770
(E.D.N.Y. Sept. 21, 2017)………………………………………………………………………1

<u>United States v. Netschi</u>, 511 F. App'x 58 (2d Cir. 2013)………………………………...8

<u>United States v. Ojala</u>, 544 F.2d 940 (8th Cir. 1976)...…………………………………14

<u>United States v. Paredes</u>, 176 F. Supp. 2d 179 (S.D.N.Y. 2001)…………………………1

<u>United States v. Silverman</u>, 861 F.2d 571 (9th Cir.1988)………………………………..10

<u>United States v. Tse</u>, 375 F.3d 148 (1st Cir. 2004)……………………………………....12

<u>United States v. Vrancea</u>, No. 12-CR-198 (WFK), 2013 WL 57687
(E.D.N.Y. Jan. 4, 2013)………………………………………………………………………...2


<u>FEDERAL STATUTES</u>

18 U.S.C. § 1512(c)(1)…………………………………………………………1-2

Fed. R. Evid. 609(a)(1)(B)……………………………………………………...12

21 U.S.C. § 841(a)(1)……………………………………………………………....12

21 U.S.C. § 846……………………………………………………………………....12

21 U.S.C. § 843(b)…………………………………………………………………...12

A.  Preliminary Statement

This Memorandum of Law is submitted on behalf of defendant Julian Gonzalez in opposition to the Government's September 16, 2024 motions *in limine* (ECF # 58).

"The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." United States v. Hamlett, No. 3:18-cr-24 (VAB), 2018 WL 4854627(D. Conn. Oct. 5, 2018) (internal citations omitted). "Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." United States v. Paredes, 176 F. Supp. 2d 179, 181 (S.D.N.Y. 2001). Moreover, "a district court's ruling on a motion in limine is preliminary and 'subject to change when the case unfolds.' " United States v. Johnson, 16-CR-457-1 (NGG), 2017 WL 5125770 (E.D.N.Y. Sept. 21, 2017)(quoting Luce v. United States, 469 U.S. 38, 41 (1984)).

B.  The Charged Offense And Its Elements

Mr. Gonzalez is charged in a single-count Indictment with violating 18 U.S.C. § 1512(c)(1) on the theory that, rather than to embarrass Agent Tactuk personally for his unprofessional conduct, the motivation for Mr. Gonzalez's successful scheme to regain possession of a cellular telephone he had already decided to surrender to Agent Tactuk and for which Tactuk had issued a rec eipt, was to obstruct justice by preventing the Federal Bureau of Investigation ("FBI") from executing a judicially authorized search warrant (the "Search Warrant").

Section 1512(c)(1) criminalizes "corruptly" attempting to alter or destroy an object "with the *intent to impair the object's* integrity or *availability for use in an official*

1

*proceeding."*  "To secure a conviction under § 1512(c)(1), the government must prove beyond a reasonable doubt (1) that at the time of the defendant's conduct, "an official proceeding was pending, was about to begin, or was reasonably foreseeable; (2) that the [d]efendant *acted* knowingly and *corruptly* to destroy *evidence*; and (3) that the [d]efendant did so with the intent of impairing the object(s)' use in the official proceeding." United States v. Vrancea, No. 12-CR-198 (WFK), 2013 WL 57687 at 2 (E.D.N.Y. Jan. 4, 2013).

### C.  The Events Leading To The Offense Conduct

    1.  The Facts Establishing Probable Cause

On October 5, 2022, a newly minted FBI confidential informant sought and received a kilogram of cocaine from Mr. Gonzalez for $22,000, purportedly to sell on consignment.  Tactuk March 17, 2023 Affidavit ("Tactuk Affidavit) a t ¶8 (JG 127-128).

On October 15, 2022, the CI met Mr. Gonzalez in a Yonkers parking lot and gave him $10,000 of the FBI's cash as partial payment for the kilogram. Tactuk Affidavit at ¶ 9 (JG 128).

On November 2, 2022, in response to an October 29, 2022 text message from the subject phone via the encrypting Signal cellphone application stating that the CI needed to "close out the tab", the CI gave Mr. Gonzalez an additional $10,000 of the FBI's money in the same Yonkers parking lot.  Id. (JG 128-29)

On November 16, 2022, the CI again me with Mr. Gonzalez and paid him the final  $2,000.  In that recorded meeting Mr. Gonzalez related, inter alia, that he GONZALEZ needed an additional supply of cocaine, because he had recently received

an order for 10 kilograms of cocaine but only had four kilograms available. Tactuk Affidavit at ¶ 9 (JG 129).

    2. <u>St Patrick's Day 2023</u>

Mr. Gonzalez expects to establish at trial that, after he had surrendered the subject phone to CBP agents upon his arrival at JFK Airport on the evening of March 17, 2023, Agent Tactuk appeared and provided him a copy of the search warrant that justified that seizure. Gonzalez Aff. at ¶ 3. While Mr. Gonzalez was attempting to examine the warrant, the phone, which agents had placed nearby, rang incessantly. Because the subject phone had a feature that announces a caller's name, Mr. Gonzalez knew it was his wife, who was elsewhere in the airport waiting to pick him up, who was calling. When Mr. Gonzalez asked Agent Tactuk to answer the phone and alert his worried wife to what was transpiring, Agent Tactuk gave the phone to Mr. Gonzalez. After explaining his predicament to his wife and ending her call, Mr. Gonzalez returned the phone to Agent Tactuk.

Agent Tactuk explained to Mr. Gonzalez that his options were to provide the passcode to FBI agents so that they could examine the phone then and there or to surrender the phone so that agents could bring the phone elsewhere and download its contents. Gonzalez Aff. at ¶ 7. Mr. Gonzalez told Agent Tactuk that he could keep the phone. <u>Id</u>. Agent Tactuk left, returned with a receipt for Mr. Gonzalez and informed him that he was free to leave. <u>Id</u>. at ¶ 8. Because Mr. Gonzalez had not committed his wife's phone number to memory, as he gathered his belongings, he asked to see the phone one more time to retrieve her number. <u>Id</u>. at ¶ 9. Mr. Gonzalez opened the phone and dictated the number to Agent Tactuk, who wrote it down. <u>Id</u>. Before the phone automatically

3

relocked, another agent snatched the phone from him.  <u>Id.</u> at ¶ 10.  Two agents began scrolling through the phone, pausing periodically to take screenshots with their own phones. <u>Id.</u>  As the agents took twenty-plus screen shots, they taunted Mr. Gonzalez, elbowing each other, pointing fingers at him and telling him that he "was fucked." <u>Id.</u> at ¶ 11.

Regretting his cooperation and resolving to seek retribution, Mr. Gonzalez, too, resorted to subterfuge.  Gonzalez Aff. at ¶ 12.  Mr. Gonzalez asked his antagonists to return the phone so that he could tell his wife that he was coming out to meet her. <u>Id.</u> Agent Tactuk instructed his taunters to return the phone to Mr. Gonzalez.  <u>Id.</u> at ¶ 13. Mr. Gonzalez asked Agent Tactuk to recite his wife's number and called her. <u>Id.</u>  After completing the call with his wife, Mr. Gonzalez slammed the phone down with as much force as he could summon, then used a foot to stomp on it. <u>Id.</u> at ¶ 14.

The CBP officers promptly tackled Mr. Gonzalez, cuffed his hands and feet and shackled him to a bench.  Gonzalez Aff. at ¶ 15.  Agent Tactuk accused Mr. Gonzalez of obstructing justice and told him that he had to call an AUSA to find out what to do with Mr. Gonzalez.  <u>Id.</u> at ¶ 16.  Agent Tactuk returned an hour later and told Mr. Gonzalez that it was his lucky day, he was free to leave.  <u>Id.</u> at ¶ 17.

3.  <u>Mr. Gonzalez's Post St. Patrick's Day Activities</u>.

Mr. Gonzalez found his irate wife parked outside of Terminal 8.  She drove him to the couple's Yonkers home, where they spent the night.  Gonzalez Aff. at ¶ 18. Because he and his wife were feuding throughout March 18, he decided to spend that night in a hotel. <u>Id.</u> at ¶ 19.  Mr. Gonzalez drove a 2022 Ford Explorer with plate number HXL2100 egistered to him to the hotel nearest to his Ridge Hill home, the Royal

4

Regency on Tuckahoe Road in Yonkers, where I registered in my own name. Id. at ¶ 20. I left the car, with the registered license plates, in the hotel parking lot.  Id.

Several days later, Mr. Gonzalez used an Expedia account in his own name to book a room at another nearby hotel, the Courtyard Marriott hotel at 5 Executive Boulevard in Yonkers.  Gonzalez Aff. at ¶ 21.  He booked the room for March 21-28. Id. He drove the same car to the Marriott where he again registered in his own name and paid with an American Express card in his own name. Id.   He again left the car, with the registered license plates, in the hotel parking lot. Id.

When Westchester County authorities arrested him on March 26, he was driving the same car with the same plates near the Marriott, on Executive Boulevard in Yonkers. Gonzalez Aff. at ¶ 21.   At the time of his arrest, Mr. Gonzalez happened to have three Texas apportioned tractor-trailer license plates in his Ford Explorer.  At the time, he owned a trucking business, Knights Templar Logistics, LLC.  He often parked the business's three tractor trailers on the street or in a commercial New Jersey parking lot. Because thieves steal the apportioned plates, when his trucks were idle and parked for any extended period, Mr. Gonzalez's custom was to remove the plates.

ARGUMENT

I.  Unnecessary To Complete The Story Of The Charged Crime, The Court Should
    Rule The Facts On Which The Agents Secured Their Search Warrant Inadmissible
    As Direct Evidence And More Prejudicial Than Probative.

(responding to the Gov't's Point I argument that evidence of Mr. Gonzalez's involvement
in narcotics distribution is admissible as direct evidence or, alternatively, pursuant to
Rule 404(b))

The government seeks to call witnesses to testify that "(i) the FBI obtained the

Search Warrant in connection with an investigation into Defendant's involvement in

narcotics distribution; (ii) when initially executing the Search Warrant, FBI agents—in

the presence of Defendant—observed on Defendant's Phone communications that

appeared to relate to narcotics distribution; and (iii) following Defendant's arrest, the FBI

uncovered additional evidence of Defendant's involvement in drug trafficking, including

the recovery from Defendant's vehicle of a bag that subsequently tested positive for

cocaine residue (collectively, the "Uncharged Conduct")." Gov't Memo at 7-8

"'[E]vidence of uncharged criminal activity is not considered other crimes

evidence under [Rule] 404(b) if it arose out of the same transaction or series of

transactions as the charged offense, if it is inexorably intertwined with the evidence

regarding the charged offense, or if it is *necessary* to complete the story of the crime on

trial.'" United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000)(emphasis added).  Here,

the particulars of Mr. Gonzalez's alleged activities prior to 8:45 p.m. on March 17, 2023

are unnecessary to complete the story of the charged obstruction offense.

Contrary, to the Government's claim, Mr. Gonzalez does not propose that the

narrative begin in the purposely cameraless interrogation room.  See Memo ("To begin

the narrative of the trial at the point where Defendant slammed Defendant's Phone on the

ground in a room at JFK, without offering any explanation for his presence there or the relevance of Defendant's Phone, would confuse the jury and provide an incomplete picture of relevant events.")

     All the jury need know to avoid any disadvantage to the Government is that a judge decided that Agent Tactuk had established probable cause to seize and search Mr. Gonzalez's phone, a judge had that day issued a warrant authorizing Agent Tactuk to do so and Agent Tactuk had shared that warrant with Mr. Gonzalez shortly after CBP officers had seized the subject phone. Although Mr. Gonzalez imagines that the Government would prefer to elicit those facts from Agent Tactuk in living color, he is willing to stipulate to those facts should the Government prefer. The facts underlying that probable cause finding are irrelevant to Mr. Gonzalez innocence or guilt of the charged offense. Other than as propensity evidence introduced to besmirch Mr. Gonzalez in the eyes of the jury, they have no probative value.

     That Mr. Gonzalez had agreed to surrender the phone and been issued a receipt for it before he damaged it undermines the Government's suggestion that it was the agents' discovery of communications that "*appeared to*" the agents "to related to narcotics distribution." Gov't Memo at pp. 7-8 (emphasis added). See also id. at p.9. ("…evidence of the Uncharged Conduct shows that Defendant's attempt to destroy Defendant's Phone had a clear logical and temporal nexus to this foreseeable official proceeding. Indeed, Defendant's obstructive conduct occurred while FBI agents were executing the Search Warrant, as he observed the FBI agents review incriminating communications that *he—as the user* of Defendant's Phone—*would know related to his narcotics distribution.*"). In fact, the agents misinterpreted the significance of their

discovery.  The screenshots, which include pictures of marijuana and a price schedule for different strains of the plant, are unrelated to the activity the FBI was investigating.  See GJ

Where the issue is Mr. Gonzalez's intent in destroying the phone, evidence of extraneous criminality would be far more prejudicial than probative.

II.    <u>FRE 803 Permits Mr. Gonzalez To Introduce His Statement At The Time He Agreed To Permit Agent Tactuk To Retain The Subject Phone  To Controvert The Government's Theory That It Was His Concern That The Phone's Contents Could Incriminate Him That Prompted The Offense Conduct</u>
(responding to the Gov't's Point II argument seeking to preclude Mr. Gonzalez from introducing his own statements)

Rule 803(3) of the permits a defendant introduce his own out-of-court statements as evidence of his then-existing state of mind. "To fall within Rule 803(3)'s 'state of mind' hearsay exception, the statements sought to be introduced must relate to the declarant's state of mind during the illegal conduct," <u>United States v. Netschi</u>, 511 F. App'x 58, 61 (2d Cir. 2013)(cleaned up).  Here, to controvert the Government's suspect claim that it was the phone's content rather than the agents conduct that aroused Mr. Gonzalez passions, Mr. Gonzalez seeks to elicit his statement upon choosing the second of the two options Agent Tactuk, offered him, "Fine, take the phone, it's yours; there's nothing there that can hurt me." Gonzalez Aff. at ¶ 7.  It was after that that Agent Tactuk returned with the property receipt and his colleagues provoked the charged conduct.  The Government would remain free to argue that Mr. Gonzalez's conduct was prompted by his tormentors' discovery of something Mr. Gonzalez overlooked or forgot, but his

comments clearly fall within the exceptions parameter's and, as an element of the offense, his state of mind is relevant.  See Gov't Memo at 18 ("Defendant clearly had personal knowledge of his guilt with respect to the charged offense and *his state of mind is thus clearly relevant*.") To preclude it would infringe on his right to present a defense.

III.    Should The Court Rule Them Relevant, Mr. Gonzalez Consents To Admitting Hotel And DMV Records Without Custodial Witnesses
          (responding to the Gov't's Point III argument that it should be permitted to introduce self-authenticating records without a custodial witness)

Should the Court rule them relevant and they be presented in their entirety, see Point IV, infra, Mr. Gonzalez has no objection to admitting *all* the hotel and DMV records without custodial witnesses.

IV.    Where Mr. Gonzalez Was Informed That He Was Free To Leave Both Before And After The Offense Conduct, Nothing He Did Thereafter Can Fairly Be Found To Be Flight From The Consequences *Of The Charged Offense*.
          (Responding to the Government's Point IV argument that hotel stays the undercover officer who)

"[B]efore a court may instruct a jury regarding flight, a satisfactory factual predicate must exist from which the jury can infer consciousness of guilt from flight.  United States v. Al-Sadawi, 432 F. 3d 419, 424 (2d Cir. 2005)(citations omitted).  Since flight evidence can be powerful, the requirement of a sufficient factual predicate "ensures that the evidence is probative in a legal sense and protects the defendant against the

9

possibility of the jury drawing unsupported inferences from otherwise innocuous behavior." Id.

According to the Government, the facts that, rather than his home in New York, Mr. Gonzalez" stayed at multiple hotels in the New York metropolitan area after the offense conduct on March 17, 2023, Gov't Memo at 15, provides the Court a satisfactory factual predicate of flight for the Court to find it reasonable for the jury to infer consciousness of guilt.

Rather than on the ambiguous snapshot the Government offers, the Court should make its decision on *all* the facts, facts of which the Government cannot not be aware but nevertheless neglected to put before the Court. Mr. Gonzalez spent March 18 at his Ridge Hill Home. Gonzalez Aff. at ¶ 18. For personal reasons, he opted to check into a hotel on the evening of March 18. Id. at ¶ 19. He drove a 2022 Ford Explorer registered in his name to the hotel closest to his Ridge Hill home, the Royal Regency on Tuckahoe Road in Yonkers, where he registered in his own name. Id at ¶ 20. He left the car, with the registered license plates, in the hotel parking lot. Id. After a couple of days, Mr. Gonzalez used an Expedia account in his own name to book a room at another nearby hotel, the Courtyard Marriott at 5 Executive Boulevard in Yonkers. Aff. ¶ 21. He booked that room for a week, from March 21-28, 2023. Id. He drove the same car to the Marriott where he again registered in his own name and paid with an American Express card in his own name. Id. Mr. Gonzalez again left the car, featuring the registered license plates, in the hotel parking lot. Id. Eight days after the offense conduct, Mr. Gonzalez was arrested within a few miles of his home. See United States v. Silverman, 861 F.2d 571, 582 n. 4 (9th Cir.1988) ("Evidence that a defendant fled immediately after a crime

was committed supports an inference that the flight was motivated by a consciousness of guilt of that crime. As the time between the commission of the offense and the flight grows longer, the inference grows weaker.") Although searching agents found out-of-state license plates in his car, the Government has no LPR, surveillance video or toll records to corroborate its detention hearing claim that Mr. Gonzalez had put those out-of-state apportion plates on his Ford Explorer.

The admissibility of evidence of flight depends upon the degree of confidence with which a court can draw four inferences: "(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of *the crime charged*." Al-Sadawi, 432 F.3d at 424.  Here, as in *Al-Sadawi,* the Government can't forge a single link much less a chain of inferences.  See id. ("the chain of inferences never proceeds beyond the first of these four steps") Even were the Court to conclude against the weight of that evidence that, by those utterly transparent actions, Mr. Gonzalez was somehow trying to frustrate the long arm of the law and that the first inference could fairly be drawn, logic prevents the Court from going any further.

The Government's theory is that Mr. Gonzalez committed the charged offense to avoid further incrimination on the uncharged offense.  If, rather than the spontaneous and ill-considered one he claims, Mr. Gonzalez's decision was the strategic one the Government hypothesizes, Mr. Gonzalez could not have believed that destroying the phone would not result in his immediate arrest.  If he was permitted to leave after

committing the charged offense, it is questionable whether the inference that he felt the need to flee at all is a fair one. Were the Court nevertheless willing to draw it, logic dictates that if Mr. Gonzalez did indeed feel the need it flee, it was the uncharged offense from which he was fleeing, not the charged offense. In other words, he demonstrated by his actions that he was willing to be arrested for destroying the phone. The factual foundation for the Government's theory of admissibility is far too flimsy to permit the Court to draw the prerequisite inferences with *any* confidence.

V.    Introduction of Mr. Gonzalez's Prior Convictions Would Be More Prejudicial
      Than Probative
      (Responding to the Government's Point V argument seeking permission to cross-examine Mr. Gonzalez on his prior convictions)

Pursuant to his September 2002, guilty pleas in the Eastern District of Pennsylvania to conspiracy to distribute cocaine in violation of 21 U.S.C. § 846; distribution of cocaine (21 U.S.C. § 841(a)(1)); and use of a communication facility to facilitate drug felony (21 U.S.C. § 843(b)) Mr. Gonzalez was sentenced in December 2002 to 110 months' imprisonment followed by five years of supervised release. See United States v. Berry, et al., No. 2:01-CR-545.

If the witness is a criminal defendant, Federal Rule of Evidence 609 permits him to be impeached with evidence of a prior felony conviction "if the probative value of the evidence outweighs its prejudicial effect to that defendant." Fed. R. Evid. 609(a)(1)(B). For non-dishonesty-nor-false-statement felonies used for impeachment of criminal defendants, there is a presumption of non-admissibility, and the burden is on the government to demonstrate admissibility. United States v. Tse, 375 F.3d 148 (1st Cir. 2004).

12

In weighing the probative versus prejudicial value of impeaching a defendant with a prior conviction, courts generally consider five factors: (1) the impeachment value of the prior crimes; (2) the date of the convictions and the defendant's subsequent history; (3) the degree of similarity between the past crimes and the charged crime, with dissimilarity favoring admission; (4) the importance of the defendant's testimony; and (5) the centrality of the credibility issue.  United States v. Hayes, 553 F.2d 824, 828 (2d Cir. 1977).

While any conviction, including one involving controlled substances can be valuable for impeachment purposes," Mr. Gonzalez's drug-related convictions shed little light on his credibility, especially where, rather than contest them, he disposed of them by guilty plea. As the Government acknowledges, the age of the convictions militate against admitting them. While the Government argues that the dissimilarity between the convictions and the charged offense favor admissibility, where it also seeks to admit evidence of narcotics related activity to support its theory that Mr. Gonzalez destroyed the phone to frustrate a narcotics investigation, that argument seems a little disingenuous.  Mr. Gonzalez does not dispute that, given the blue wall of silence, extracting the truth about the offending agents by cross examination alone may be more than he can expect of even the most skilled cross-examiner. It is certainly possible that his testimony becomes necessary to corroborate the strong circumstantial evidence supporting his version of events.  Corroboration notwithstanding, were he compelled to take the witness stand, his credibility would certainly be a central issue.

The Government may prefer to regale the jury with tales of Mr. Gonzalez's historical misdeeds rather than rely on its own skill at cross-examination.   Where they could well overwhelm truthful testimony and thereby prove outcome-determinative, however, admitting his prior convictions here would be more prejudicial than probative.

13

VI.     Lest It Infringe On Mr. Gonzalez's Right To Present A Defense, The Court
        Should Be Cautious In Limiting The Scope Of Closing Argument
            (Responding to the Government's Point VI argument seeking to preclude Mr.
Gonzalez from arguing that his apparently unsuccessful attempt to destroy did no harm)

        The Fifth and Sixth Amendments guarantee criminal defendants the right to

present a defense. Herring v. New York, 422 U.S. 853, 862 (1975).

        It can hardly be questioned that closing argument serves to sharpen and clarify
        the issues for resolution by the trier of fact in a criminal case. For it is only after
        all the evidence is in that counsel for the parties are in a position to present their
        respective versions of the case as a whole. Only then can they argue the
        inferences to be drawn from all the testimony, and point out the weaknesses of
        their adversaries' positions. And for the defense, closing argument is the last clear
        chance to persuade the trier of fact that there may be reasonable doubt of the
        defendant's guilt.
        The very premise of our adversary system of criminal justice is that partisan
        advocacy on both sides of a case will best promote the ultimate objective that the
        guilty be convicted and the innocent go free. In a criminal trial, which is in the
        end basically a factfinding process, no aspect of such advocacy could be more
        important than the opportunity finally to marshal the evidence for each side before
        submission of the case to judgment.
Herring v. New York, 422 U.S. 853, 862 (1975)(internal citations omitted).

        The closing arguments of counsel are "limited to the facts in evidence and

reasonable inferences flowing therefrom." United States v. Ojala, 544 F.2d 940, 946 (8th

Cir. 1976).   Where the Court will properly instruct the jury on the elements of the

charged, attempt, offense, Mr. Gonzalez should not be precluded from any argument that

the facts support, including that, whatever his intent, his efforts at destroying the phone

were ultimately unsuccessful.

14

VII.   <u>Mr. Gonzalez Does Not Seek To Introduce Evidence Of The Consequences Of Conviction</u>
(Responding to the Government's Point VII argument seeking to preclude Mr. Gonzalez from presenting evidence or argument concerning the consequences of conviction)

Mr. Gonzalez has no intention of introducing or eliciting any evidence on the

consequences of a conviction.

VIII.   <u>Mr. Gonzalez Does Not Expect To Seek To Elicit Evidence About The Confidential Informant</u>
(Responding to the Government's Point VIII argument seeking to preclude Mr. Gonzalez from eliciting evidence of the identity or background of the confidential informant)

For the reasons stated in Point I, *infra*, Mr. Gonzalez does not believe the

confidential informant or his identity is relevant to the charged offense.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Gonzalez's respectfully requests that the Court

rule as suggested herein.

Dated: September 23, 2024

Respectfully submitted,

____/s/ Patrick Brackley_____
PATRICK BRACKLEY, ESQ.
Attorney for Julian Gonzalez
233 Broadway, suite 2370
New York, New York 10016
Email: patrickbrackley@aol.com

Thomas Eddy, of counsel
<u>On The Memorandum</u>.

15